UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) ) ) |
| v. | ) ) Case No. 4:21CR161 MTS (SPM) |
| CARRELL LAMARK WRIGHT, | ) ) ) |
| Defendant. | ) |

**REPORT AND RECOMMENDATION AND
MEMORANDUM OPINION OF UNITED STATES MAGISTRATE JUDGE**

All pretrial matters in the above-referenced case have been referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(b). Currently before the Court is Defendant Carrell Wright's Motion to Suppress Evidence and Statements (Doc. 41). On February 5, 2021, Wright was a passenger in a white Jeep Grand Cherokee being operated by Ebony Crossland. At approximately 8:45 p.m., Officer Benjamin Eilerman with the St. Louis Metropolitan Police Department conducted a traffic stop of the Jeep after observing that temporary tags on the Jeep had expired. During the traffic stop, Wright was placed under arrest after police discovered marijuana and other suspected narcotics. Wright contends police violated the Fourth Amendment by converting the traffic stop into a criminal investigation *before* they had reasonable suspicion or probable cause to believe criminal activity was afoot. As such, Wright seeks an order suppressing all evidence and statements obtained after the Fourth Amendment violation.

## BACKGROUND AND PROCEDURAL HISTORY

Defendant Carrell Wright is charged in a five-count indictment with escape from a residential reentry center on or about December 7, 2020 (Count 1); being a felon in possession of a firearm (Count 2); possession with intent to distribute fentanyl (Count 3); possession with intent to distribute methamphetamine (Count 4); and possession of a firearm in furtherance of a drug trafficking offense (Count 5). The charges asserted in Counts 2 through 5 arose from Wright's arrest by St. Louis Metropolitan Police on February 5, 2021. On March 5, 2021, Wright was arrested on the federal charges and appeared before the undersigned for an initial appearance and arraignment.  On Wright's behalf, defense counsel repeatedly requested, and was repeatedly granted, time to review discovery, complete an investigation, and file pretrial motions. On November 2, 2021, Wright filed a Motion to Suppress Evidence and Statements (Doc. 41). The Government filed its response on November 9, 2021 (Doc. 42). After conferring with the parties at a scheduling conference, the undersigned scheduled an in-person evidentiary hearing on December 13, 2021.

The parties appeared as scheduled for an evidentiary hearing during which the United States presented testimony by St. Louis Metropolitan Police Officers Benjamin Eilerman and Michael Humme. Wright presented no witness testimony but cross examined the officers and entered video footage of the traffic stop as Defendant Exhibits A (Humme Bodycam. Video), B (Eilerman Bodycam. Video), and C (Eilerman Dashcam Video),

without objection from the United States. At the close of the evidentiary hearing, the parties requested and were granted time to request a transcript of the hearing and to file post-hearing briefs. Briefing by both parties was completed on March 3, 2022, and the matter is now fully briefed and ready for a ruling. *See* Docs. 55 & 58.

The undersigned has reviewed the video footage of the traffic stop and has carefully considered all evidence that was offered and admitted at the evidentiary hearing, including the credibility of the witnesses. The undersigned has also considered the arguments of the parties both at the hearing and in their written submissions and researched case law applicable to the issues raised. Based upon the evidence adduced at the hearing and the written submissions of the parties, the undersigned makes the following findings of fact and conclusions of law.

## **FINDINGS OF FACT**

On February 5, 2021, at approximately 8:45 pm, St. Louis Metropolitan Police Department Officer, Benjamin Eilerman, conducted a traffic stop of a white Jeep Grand Cherokee being operated by Ebony Crossland. Defendant Wright was a front-seat passenger in the Jeep. There were two other passengers in the back seat: Deonte Overall and a woman whose name was not introduced at the hearing.

Officer Eilerman activated the patrol vehicle emergency lights and sirens to conduct a traffic stop after observing that the Jeep had no front license plate, had heavily tinted windows, and had an expired Missouri temporary tag. Approximately 38 minutes after first curbing the Jeep, Officer Eilerman issued Crossland two traffic violation tickets and

released her and the other female passenger from the scene. Wright and Deonte Overall were charged with drug-related offenses and taken into custody.

Officer Eilerman was assisted at the scene by Officer Michael Humme who arrived approximately 3 minutes into the traffic stop. Both officers were equipped with, and utilized, body cameras. In addition, Officer Eilerman's patrol car was equipped with a dashboard camera. As a result, Wright's interactions with both officers were captured by audio and time-stamped video recordings.

When Officer Eilerman first activated his lights, the Jeep pulled over right away. Although there were four people in the Jeep, Officer Eilerman did not initially notice the two passengers in the back seat. The following occurred in the first 2 minutes of the stop:

- Officer Eilerman approached from the driver's side window and told Crossland that he stopped her because of the expired temporary tag.

- Before asking for any identification, Officer Eilerman asked Crossland if she had any weapons in the car. She answered affirmatively and told Eilerman where to find the firearm. Officer Eilerman asked Crossland to get out of the car so he could "render [the gun] safe."

- Officer Eilerman also asked Wright if he had any weapons on him; Wright denied that he did.

- Once Crossland was out of the car, Officer Eilerman retrieved the gun from under Crossland's seat then asked if she had her driver's license.

- As Crossland looked through her purse for her identification, Officer Eilerman asked Wright if he had his driver's license as well. Wright responded he did not. Shortly after that, Crossland handed Officer Eilerman her driver's license and got back into the Jeep.

After obtaining Crossland's driver's license, Officer Eilerman delayed conducting a records check of Crossland for approximately 2 minutes so that he could collect identification and/or pedigree information, first, from Wright and, later, from the female passenger in the back seat. Specifically, the following exchange began about 2 minutes into the traffic stop and lasted for approximately 1 minute:

- Officer Eilerman whipped out a pencil and pad, leaned into the driver's window and, speaking to Wright, stated "Sir, let me get your info . . . ." Officer Eilerman then asked Wright for his last name. Wright responded that it was "Overall."

- Next, Eilerman asked Wright for his first name. Wright stated it was "Larry."

- Eilerman asked Wright for his date of birth. Wright hesitated. After a noticeable pause, Wright asked the officer why he needed the information.

- Eilerman responded "this is an investigation" he indicated they were "being detained" because of the plates and so "I have to investigate everybody in the car." [At the evidentiary hearing, Officer Eilerman explained that it was a "routine practice" of his department to ask passengers who are not operating

the vehicle for identification and to run the names of such passengers "just to see if they have any active warrants."] *See* Doc. 51 (Hrng. Tr., at p. 25).

- After explaining to Wright why he needed his date of birth, Eilerman asked Wright again for his date of birth. This time, Wright provided a date of birth.

- When Eilerman asked Wright for his social security number, Wright stated he did not know it. In response, Officer Eilerman asked if Wright had "warrants or something." Wright's response was unclear. Approximately 1 minute elapsed while Officer Eilerman questioned Wright about his pedigree information.

Approximately 3-4 minutes into the traffic stop Officer Eilerman headed back to his patrol car to conduct a records inquiry. Officer Humme arrived as back-up just as Officer Eilerman was headed back to this patrol car. Officer Humme approached the passenger side of the Jeep and shined his flashlight into the back seat. Before Officer Eilerman could re-enter his patrol car, Officer Humme signaled that there were four individuals in the Jeep. Officer Eilerman then returned to the Jeep where he spent additional time (approximately 1 minute) obtaining an expired driver's license from the female passenger in the rear driver's side seat.

Approximately 4 minutes into the traffic stop Officer Eilerman returned to his patrol car to begin his records inquiry. Officer Eilerman spent approximately 2-3 three minutes conducting a records inquiry of Crossland, Larry Overall (the name given by Wright), and the backseat female passenger. His inquiry confirmed that Ebony Crossland was, in fact,

the registered owner of the Jeep. However, the inquiry into Larry Overall—the name given by Wright—indicated that the name did not match the birthdate provided by Wright, suggesting to Officer Eilerman that Larry Overall was not Wright's real name. In addition, the inquiry revealed that Larry Overall had a warrant for his arrest and was a convicted felon.[1] Approximately 6 minutes into the traffic stop, Officer Eilerman completed his records inquiry and got out of his patrol car.

Approximately 4 minutes into the traffic stop (just as Eilerman was returning to his patrol car to begin the records check), back-up Officer Humme seized a bag of suspected marijuana from Deonte Overall who was seated behind Wright. Officer Humme ordered Deonte Overall out of the vehicle and placed him under arrest for possession of marijuana.

During the 2 to 3 minutes in which Officer Eilerman conducted his records inquiry, Officer Humme also interacted with Wright. Once Deonte Overall was handcuffed, Humme turned his attention to Wright who was still seated in the front passenger seat at that point. Officer Humme shared with Wright that he found it suspicious that Wright did not know his social security number. He asked Wright to get out of the Jeep and Wright complied. As Wright got out of the car, he removed a bag that had been strapped to his body and left it inside the Jeep. Among other things, Officer Humme asked Wright if he had any "weed" on him. Wright indicated that he did. Officer Humme patted him down, removed the suspected marijuana, advised Wright he was under arrest for marijuana, and

---

[1] Officer Eilerman credibly testified that he did not arrest Wright based upon the Larry Overall warrant because he was pretty sure Wright was not Larry Overall. Based on the interactions between the officers and Wright captured on the bodycam video footage, it is clear that neither officer believed Wright was Larry Overall.

read him *Miranda* warnings from a card. Officer Humme then reached into the car and searched the bag Wright had removed and found suspected narcotics and ammunition. At that point, Officer Humme advised Wright that he was under arrest for possession of additional controlled substances. Officer Humme flashed his flashlight in the direction of Officer Eilerman, seated in his patrol vehicle, to alert him that he found something. Very shortly thereafter, Officer Eilerman exited the patrol vehicle and joined the men on the sidewalk.

Based on the items found in Wright's bag and on his person, Officer Humme advised Crossland that he was going to search the entire car. Thereafter, Officer Humme placed Wright's seized bag in his patrol vehicle and then asked Crossland and the female backseat passenger to exit the Jeep so that he could conduct a search. Humme searched the Jeep and ultimately found and seized a 9-millimeter handgun under the front passenger seat where Wright had been seated and a loaded AR style pistol in the trunk. Wright and Overall were transported to the St. Louis Justice Center. Once at the Justice Center officers were able to determine that the front passenger was Carrell Wright, a convicted felon with an outstanding warrant from the U.S. Marshal's Service.

Although Wright refused to provide his information when pressed by the officers to do so, the entire interaction between the officers, Wright, Crossland, and the other passengers was generally cordial. The officers did not express either on the video or in court any concern for their safety during the traffic stop, and Wright and the other occupants of the Jeep were compliant with the officers' commands. The officers'

testimony at the evidentiary hearing was credible and largely consistent with the dashcam and bodycam videos introduced into evidence.

## CONCLUSIONS OF LAW

Wright seeks an order suppressing both physical evidence and any statements he made after police conducted a traffic stop of Crossland's Jeep. Wright does not appear to dispute that the police had probable cause to conduct the traffic stop. Indeed, Officer Eilerman's testimony at the hearing and the dashcam video (Deft. Ex. C) demonstrated that Officer Eilerman had probable cause to stop the Jeep for expired temporary tags. *United States v. Callison,* 2 F.4th 1128, 1131 (8th Cir. 2021) (holding that any traffic violation, no matter how minor, gives a police officer probable cause to stop the driver).

Nor can it be seriously disputed that approximately 4 minutes into the stop Officer Humme had developed reasonable suspicion, if not probable cause, to extend the traffic stop. At that point, the rear seat passenger, Deonte Overall, admitted to Officer Humme that he had "weed on him." This admission gave the officers reasonable suspicion, if not probable cause, to, at a minimum search the car for contraband. *See United States v. Mayfield*, 678 Fed.Appx.437, 439 (8th Cir. 2017) (holding "the odor of marijuana emanating from a vehicle provides probable cause to search the vehicle pursuant to the automobile exception to the Fourth Amendment's prohibition of warrantless search and seizures"); *United States v. Payne*, 119 F.3d 637, 642 (8th Cir.1997) (holding "[p]olice may search a car without a warrant if they have probable cause to believe that the car contains contraband or evidence.").

However, Wright's central complaint appears to be that even before Officer Humme developed reasonable suspicion of criminal activity, Officer Eilerman unreasonably extended the traffic stop by conducting a general criminal investigation without reasonable suspicion or probable cause. In support of that argument, Wright points to Eilerman's statements, made 2 minutes into the stop, that Wright was "detained" and that he needed Wright's date of birth because he was conducting an "investigation;" Wright also points to the fact that Eilerman pressed Wright for pedigree information, such as his social security number, after Wright said he did not have any identification. *See* Doc. 55, at p. 2-3.[2]

"A lawfully-initiated traffic stop can become unlawful if it is unreasonably extended." *Callison*, 2 F.4th at 1131. In *Rodriguez v. United States,* the Supreme Court held that "a police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures." 575 U.S. 348, 350-51 (2015)). In so holding, the Supreme Court explained that "[l]ike a *Terry* stop, the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's mission—to address the traffic violation that warranted the stop and attend to related safety concerns." *Id.* at 354. The Court acknowledged that the Fourth Amendment tolerates certain "unrelated investigations that [do] not lengthen the roadside detention"

---

[2] Wright's post-hearing brief also suggests that the officers violated the Fourth Amendment by asking him to get out of the Jeep. However, this argument lacks merit because ordering Wright out of the Jeep did not unlawfully prolong the traffic stop for the reasons set out in the United States' post-hearing brief, Doc. 58, at p. 5-6. In addition, no unlawful extension occurred because Officer Eilerman was simultaneously conducting the records inquiry when Wright was ordered by Officer Humme to get out of the Jeep. *See Rodriguez,* 575 U.S. at 354 (concluding that if one officer "diligently pursues" the traffic-stop mission, another can concurrently conduct certain unrelated checks without violating the Fourth Amendment); *Arizona v. Johnson*, 555 U.S. 323 (2009) (holding no Fourth Amendment violation where questioning of passenger by a different officer did not lengthen the roadside detention).

but "[b]ecause addressing the infraction is the purpose of the stop, [the stop] may last no longer than necessary to effectuate that purpose. *Id.*

*Rodriguez* held that officers may conduct certain ordinary inquiries related to a traffic stop such as "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance" without independent reasonable suspicion of other crimes. *Id.* at 355. However, the Supreme Court further held that tasks not related to the traffic mission, such as "on-scene investigation into other crimes" are unlawful if they prolong the stop "absent independent reasonable suspicion." *Id.* at 354. The Supreme Court emphasized that the "critical question" is not whether the unrelated investigation "occurs before or after the officer issues a ticket," but whether conducting the unrelated investigation "prolongs—i.e., adds time to—the stop." *Id.* The Court specifically rejected the notion that "so long as the officer is reasonably diligent in pursuing the traffic-related purpose of the stop," the officer may "incrementally" prolong a stop to conduct an unrelated investigation. *Id.*

Prior to *Rodriguez,* the Eighth Circuit allowed *de minimis* extensions of traffic stops for police to conduct other investigative measures such as dog sniffs. However, *Rodriguez* specifically rejected the *de minimis* extension rule. The Eighth Circuit has since recognized that *Rodriguez* limited acceptable activities during a traffic stop to those "reasonably required to complete the mission of issuing a ticket for the violation" and "attending to related safety concerns." *Callison,* 2 F.4th at 1131 n. 2. The Eighth Circuit has also acknowledged that *Rodriguez* made clear that "investigating general criminal

wrongdoing is outside a routine traffic stop's purpose" and a seizure "justified only by a police-observed traffic violation" will become "unlawful if it is prolonged beyond the time reasonably required to complete the mission of issuing a ticket for the violation." *Id.*

While it is far from clear, Wright's post-hearing brief suggests Officer Eilerman first unlawfully prolonged the traffic stop in violation of the Fourth Amendment when he questioned Wright about his pedigree information. Under *Rodriguez*, Wright prevails on this argument only if Eilerman's inquiry into Wright's pedigree (i) was unrelated to safety or the mission of the traffic stop and aimed at investigating other crimes; (ii) "prolonged—i.e., added time"—to the traffic stop; and (iii) was not supported by reasonable suspicion of criminal activity. *See United States v. Campbell,* 26 F.4th 850, 885 (11th Cir. 2022) (holding that following *Rodriguez* "[t]he proper standard for addressing an unlawfully prolonged stop, then, is this: a stop is unlawfully prolonged when an officer, without reasonable suspicion, diverts from the stop's purpose and adds time to the stop in order to investigate other crimes.").

### A. EILERMAN'S PEDIGREE INQUIRY WAS UNRELATED TO SAFETY OR THE MISSION OF THE TRAFFIC STOP

In its post-hearing brief, the United States argued that, in general, "asking a passenger for identification and running a computer check" of the passenger is "a routine task an officer may complete so long as the officer does not convey that compliance is required." *See* Doc. 58, at p. 7. The United States cited *United States v. Slater*, 411 F.3d 1003, 1006 (8th Cir.2005) and *United States v. Cloud*, 594 F.3d 1042 (8th Cir. 2010) in

support of that argument. However, the United States cannot avail itself of *Slater* and *Cloud* for at least two reasons.

First, both cases were decided before *Rodriguez* which, as the Eighth Circuit has since acknowledged, limited acceptable activities during a traffic stop to those "reasonably required to complete the mission of issuing a ticket for the violation" and "attending to related safety concerns." *Callison,* 2 F.4th at 1131 n. 2. Because the courts in *Slater* and *Cloud* did not wrestle with question of whether asking a passenger for identification to run a records check was "reasonably required" to complete the mission of the traffic stop and attend to related safety concerns, they do not aid this Court's analysis of the issue.

Second, factual distinctions between this case and the facts of *Slater* and *Cloud* render those cases inapplicable here. Both *Slater* and *Cloud* involved sobriety-related traffic offenses. In this case, Officer Eilerman pulled the Jeep over after observing that it had no front license plate, had heavily tinted windows, and had an expired Missouri temporary tag. The fact that *Slater* and *Cloud* involved driving offenses for which the identity and driving record of any passenger would naturally take on greater relevance to the reasons for the stop—i.e., impaired driving by the driver—renders the teachings of *Slater* and *Cloud* inapplicable to the circumstances presented in this case.

The undersigned can imagine a variety of circumstances in which an officer conducting a traffic stop may need to ask a passenger for identification and run a record check to complete the mission of the traffic stop and attend to related safety concerns. However, in this case, there was no evidence presented to suggest that Officer Eilerman

needed to obtain (or reasonably required) the identification of Wright or the female passenger to complete the mission of the traffic stop or to address safety concerns. *See United States v. Landeros,* 913 F.3d 862, 868 (9th Cir. 2019) (holding the identity of a passenger ordinarily has "no relation to a driver's safe operation of a vehicle" and knowing the passenger's name "would not have made the officers any safer" instead, "[e]xtending the stop, and thereby prolonging the officers' exposure to [the passenger] was, if anything, inversely related to officer safety").

Indeed, there was no evidence presented in this case to suggest that Officer Eilerman's inquiry was in response to specific concerns related to officer safety or specific things that unfolded during the traffic stop at all. Instead, when Wright asked Eilerman why he wanted his information, Eilerman responded "this is an investigation" he told Wright they were "being detained" because of the plates and so "I have to investigate everybody in the car." At the evidentiary hearing, Officer Eilerman explained that it was a "routine practice" of his department to ask passengers who are not operating the vehicle for identification and to run the names of such passengers "just to see if they have any active warrants." *See* Doc. 51 (Hrng. Tr., at p. 25).

In sum, although there are certainly circumstances in which an officer's request for a passenger's identification may be reasonably required to complete the mission of a traffic stop or attend to safety concerns, those circumstances are not present in this case. Based on the evidence adduced at the evidentiary hearing, Officer Eilerman's investigation of

Wright (and the female passenger) was more akin to an unrelated criminal investigation than a task necessary to address safety or effectuate the purpose of the stop.

### B. EILERMAN'S PEDIGREE INQUIRY PROLONGED THE TRAFFIC STOP

In *Rodriguez,* the Supreme Court acknowledged that the Fourth Amendment tolerates certain "unrelated investigations that [do] not lengthen the roadside detention." 575 U.S. at 354-55. As such, the fact that Officer Eilerman may have been conducting an unrelated investigation into general criminal wrongdoing does not, standing alone, constitute a Fourth Amendment violation. However, the "critical question" under *Rodriguez* is whether conducting the unrelated investigation "prolongs—i.e., adds time to—the stop." *Id.* at 357. Under *Rodriguez*, prolonging a traffic stop, even "incrementally" to conduct an unrelated investigation violates "the Constitution's shield against unreasonable seizures." *Id.*

In this case, after initiating the stop, Officer Eilerman spent approximately 2 minutes doing things related to the mission of the traffic stop and attending to safety concerns. Specifically, Officer Eilerman asked Crossland and Wright if they had weapons in the car and, after Crossland admitted there was a weapon in the car, Eilerman secured Crossland's weapon and took possession of it. In the first two minutes of the traffic stop Eilerman also obtained Crossland's driver's license and learned that Wright claimed to not have his driver's license.

Although he had what he needed to conduct a records check of the driver, Officer Eilerman delayed conducting a records check of Crossland for approximately 2 minutes so

that he could collect identification and/or pedigree information, first, from Wright and, later, from the female passenger in the back seat. These facts distinguish this case from the facts in *United States v. Callison,* 2 F.4ᵗʰ 1128 (8th Cir. 2021). In *Callison*, the district court granted the defendant's motion to suppress on grounds that the police officer unlawfully extended the traffic stop roughly five minutes into the encounter when he started asking travel-related questions. *Id.* at 1131. The Eighth Circuit reversed holding that, at the time the officer started asking travel-related questions, the officer was still handling the matter for which the stop was made—issuing a ticket for an unlit license plate. *Id.* Specifically, the court pointed out that the officer had already conducted a records inquiry of the driver, but the driver was still searching for his insurance card and had not advised the officer that he did not have it. *Id.* The court concluded that because the officer's travel-related questions did not "add time" to the mission of the traffic stop, under *Rodriguez,* the officer did not need reasonable suspicion even if the travel-related questions constituted an unrelated inquiry. *Id.*

Unlike the circumstances in *Callison*, at the time Officer Eilerman whipped out his notepad and started questioning Wright, other than information he could obtain from a records check, it is not evident that Officer Eilerman needed any additional information from the driver to complete the mission of his stop—issuing a ticket for an expired temporary tag. He had already questioned Crossland and Wright about weapons; he had already secured Crossland's gun; and he had already obtained Crossland's driver's license. Because Eilerman prolonged—i.e., added time—to the traffic stop to conduct an inquiry unrelated to

safety or the mission of the stop, even though the extension may have been slight, suppression is warranted unless Officer Eilerman's inquiry was supported by reasonable suspicion of criminal activity. *See United States v. Campbell,* 26 F.4th 850, 885 (11th Cir. 2022) (holding that police violated the Fourth Amendment when they extended a stop by ***twenty-five seconds*** to question motorist about contraband without reasonable suspicion); *Landeros,* 913 F.3d at 867 (holding that *Rodriguez* effectively overruled circuit precedent that permitted "slight" delays for non-mission questioning); *United States v. Clark,* 902 F.3d 404, 411 (3d Cir. 2018) (holding that authority for the stop ended once the officer confirmed through record check that motorist had authority to drive the vehicle); *United States v. Rodriguez-Escalera,* 884 F.3d 661, 668 (7th Cir. 2018) (citing *Rodriguez* for the proposition that "prolonged detention of [a] vehicle, even if . . . slight, [i]s unlawful" without reasonable suspicion).

### C. EILERMAN'S PEDIGREE INQUIRY WAS NOT SUPPORTED BY REASONABLE SUSPICION OF CRIMINAL ACTIVITY

Following *Rodriguez,* a police officer may conduct checks unrelated to the mission of a traffic stop in a manner that prolongs the stop so long as the officer establishes "the reasonable suspicion ordinarily demanded to justify detaining an individual." *United States v. Walker,* 840 F.3d 477, 483 (8th Cir. 2016) (quoting *Rodriguez*, 575 U.S. at 355). "An officer may expand the scope of a traffic stop beyond the initial reason for the stop and prolong the detention if the driver's responses and the circumstances give rise to a reasonable suspicion that criminal activity unrelated to the stop is afoot." *United States v. Chavez Loya*, 528 F.3d 546, 553 (8th Cir. 2008). *See also United States v. Lyons*, 486 F.3d 367, 371 (8th

Cir. 2007) ("If, during a traffic stop, an officer develops a reasonable, articulable suspicion that a vehicle is carrying contraband, he has justification for a greater intrusion unrelated to the traffic offense."). The officer's suspicion must be based upon "particularized, objective facts which, taken together with rational inferences from those facts, reasonably warrant suspicion that a crime is being committed." *United States v. Jones*, 269 F.3d 919, 927 (8th Cir. 2001) (quoting *United States v. Beck,* 140 F.3d 1129, 1136)) (8th Cir. 1998)). An "inchoate and unparticularized suspicion or hunch" is insufficient. *Terry v. Ohio,* 392 U.S. 1, 27 (1968) (internal quotation marks omitted).

In determining whether the requisite degree of suspicion exists, the court must determine whether the facts collectively establish reasonable suspicion—i.e., the "totality of the circumstances" must be considered. *See United States v. Linkous*, 285 F.3d 716, 720 (8th Cir. 2002); *Jones,* 269 F.3d at 927. The court may consider any added meaning that certain conduct might suggest to experienced officers in the field, but the officer's reasonable suspicion cannot be "just a mere hunch or based on circumstances which describe a very large category of presumably innocent travelers." *Jones,* 269 F.3d at 927 (internal quotation marks omitted) (quoting *Reid v. Georgia,* 448 U.S. 428, 441 (1980)). In addition, finding a "quantum of individualized suspicion" after-the-fact is not sufficient. *United States v. Yousif,* 308 F.3d 820, 828 (8th Cir. 2002).

In this case, the United States has offered neither evidence nor argument to suggest that Officer Eilerman's inquiries about Wright's pedigree information was based upon reasonable suspicion of any criminal activity. At the evidentiary hearing, Officer Eilerman

explained that it was a "routine practice" of his department to ask passengers who are not operating the vehicle for identification and to run the names of such passengers "just to see if they have any active warrants" even though there is no legal requirement that passengers provide such information to police. *See* Doc. 51 (Hrng. Tr., at p. 25). In its post-hearing brief, the United States similarly suggested that such passenger-related inquiries are a "routine" part of any traffic stop that "an officer may complete so long as the officer does not convey that compliance is required." *See* Doc. 58, at p. 7.  In sum, the record before this Court does not demonstrate that Officer Eilerman had reasonable articulable suspicion of any criminal activity when he pressed Wright for his pedigree information.

### D. WRIGHT'S STATEMENTS AND ANY EVIDENCE SEIZED AFTER EILERMAN'S PEDIGREE INQUIRY MUST BE SUPPRESSED

For the reasons stated above, the traffic stop was first extended when Officer Eilerman diverted away from the mission of the traffic stop—issuing a ticket to the driver for an expired temporary tag—and started asking Wright for his pedigree information even though Wright was a passenger and informed the officer he did not have his driver's license. Officer Eilerman's extension of the time necessary to complete the mission of the traffic stop violated the Fourth Amendment because the extension was not supported by a reasonable, articulable suspicion that criminal activity was afoot.

The Fourth Amendment protects "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Under the exclusionary rule, evidence obtained in violation of the Fourth Amendment may not be introduced at trial to prove a defendant's guilt. *Elkins v. United States,* 364 U.S.

206, 223-24 (1960) (evidence obtained as the result of an unreasonable search and seizure by state officers cannot be used against defendant in federal court). The purpose of the exclusionary rule is to deter constitutional violations, s*ee United States v. Leon,* 468 U.S. 897, 906 (1984), and it applies to verbal statements obtained because of official misconduct as well as to the more traditional seizure of physical evidence. *United States v. Yousif,* 308 F.3d 820, 832 (8th Cir. 2002).

Because any statements as well as the evidence seized were obtained as a result the illegal detention, they are tainted and must be suppressed as fruits of an unlawful search and seizure.

Accordingly,

**IT IS HEREBY RECOMMENDED** that Defendant's Motion to Suppress Evidence and Statements (Doc. 41) be **GRANTED.**

The parties are advised that they have fourteen (14) days in which to file written objections to this report and recommendation pursuant to 28 U.S.C. §636(b)(1), unless an extension of time for good cause is obtained. Failure to timely file objections may result in a waiver of the right to appeal questions of fact. *See Thompson v. Nix,* 897 F.2d 356 (8th Cir. 1990).

Trial in this case will be conducted before the **Honorable Matthew T. Schelp**. Judge Schelp will schedule the trial later by separate order.

Dated: April 15, 2022.

SHIRLEY PADMORE MENSAH  
UNITED STATES MAGISTRATE JUDGE