UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) ) ) |
| v. | ) ) Case No. 4:21 CR 161 MTS |
| CARRELL L. WRIGHT, | ) ) ) ) |
| Defendant. | ) ) |

**MEMORANDUM AND ORDER**

Pending before the Court is Carrell Wright's Motion to Suppress Statements and Evidence, Doc. [41], Report and Recommendation of United States Magistrate Judge, Doc. [59], Memorandum and Order and Upon Reconsideration, Amended Report and Recommendation of United States Magistrate Judge, Doc. [69], and Wright's Objections to the Amended Report and Recommendation, Doc. [70].

Having conducted a de novo review of the entire record, including the transcript of the evidentiary hearing, held December 13, 2021, Doc. [51], and video recordings of the body and dash cams, (1) The Court declines to adopt the Findings of Fact as Amended by the Magistrate Judge in her Amended Report and Recommendation, Doc. [69], and sets forth its factual findings below;[1] (2) The Court adopts the Magistrate Judge's Conclusions of Law as to probable cause for the traffic stop; (3) The Court declines to adopt the Conclusion of Law, as Amended by the Magistrate Judge in her Amended Report and Recommendation, Doc. [69], finding that Officer Benjamin Eilerman's passenger pedigree inquiry was akin to an unrelated criminal investigation and unlawfully prolonged the traffic stop pursuant to *Rodriguez v. United States*, 575 U.S. 348 (2015), as discussed *infra*; (4)

---

[1] Although the Court incorporates the Magistrate Judge's factual findings in large part, in the interest of maintaining a clean record, the Court thought it the best course to issue its own factual findings.

1

The Court adopts the Magistrate Judge's Conclusion of Law as to the applicability of the attenuation exception to the exclusionary rule to this matter if the Court had found the traffic stop was unlawfully prolonged; (4) The Court overrules Wright's Objections to the Amended Report and Recommendation; and (5) The Court denies Wright's Motion to Suppress Statements and Evidence, Doc. [41].

## I. Procedural Background

Defendant Carrell Wright was charged with being a felon in possession of a firearm. He moved to suppress all evidence and statements as fruit of an unlawful traffic stop. Doc. [41]. The Government filed a response. Doc. [42]. After an evidentiary hearing, Magistrate Judge Shirley Padmore Mensah issued a report and recommendation recommending Wright's motion to suppress statements and evidence. Doc. [59]. The Magistrate Judge found that the police had probable cause to conduct the traffic stop due to the expired temporary tags and that it cannot "be seriously disputed that approximately 4 minutes into the stop Officer Michael Humme had developed reasonable suspicion, if not probable cause, to extend that traffic stop" because at that point the rear passenger had admitted having "weed on him" and that, at minimum, gave the officers reasonable suspicion, if not probable cause, to search for contraband. *Id.* at 9.

However, the Magistrate Judge found that the traffic stop was unreasonably prolonged, pursuant to *Rodriguez*, 575 U.S. 348, for approximately two minutes, when Officer Eilerman delayed conducting a record check of Ebony Crossland (the driver) so he could collect identification and/or pedigree information from Wright, and then later from a female passenger in the backseat. Doc. [59] at 15-16. The Magistrate Judge determined that without independent reasonable suspicion,[2] Officer Eilerman diverted away from the mission of the traffic stop to obtain passenger pedigree information

---

[2] The Magistrate Judge found in her Report and Recommendation that the Government "offered neither evidence nor argument to suggest that Officer Eilerman's inquiries about Wright's pedigree information was based upon reasonable suspicion of criminal activity." *Id.* at 18.

2

that was not reasonably required to complete the mission of the traffic stop and was unrelated to safety concerns. "[I]t is not evident that Officer Eilerman needed any additional information from the driver to complete the mission of the stop—issuing a ticket for an expired temporary tag. He had already questioned Crossland and Wright about weapons; he had already secured Crossland's gun; and he had already obtained Crossland's driver's license." *Id.* at 16. The Magistrate Judge concluded that "[b]ecause Eilerman prolonged—i.e., added time—to the traffic stop to conduct an inquiry unrelated to safety or the mission of the stop, even though the extension may have been slight, suppression is warranted unless Officer Eilerman's inquiry was supported by reasonable suspicion of criminal activity." *Id.* at 16-17.

The Government subsequently file a motion for reconsideration of the Magistrate Judge's Report and Recommendation, arguing (1) that Officer Eilerman's pedigree inquiry of the passengers was related to the mission of the traffic stop and officer safety, and therefore did not unlawfully prolong the traffic stop; and (2) that even if the court declined to reconsider its finding that the request for pedigree information unlawfully extended the traffic stop, it should reconsider its recommendation of application of the exclusionary rule to suppress evidence and statements pursuant to the attenuation doctrine. After reviewing the Government's Motion and Wright's Response, the Magistrate Judge issued an Amended Report and Recommendation, granting the motion for reconsideration in part and denying it in part.  Doc. [69]. The Magistrate Judge amended her factual findings, *see* Doc. [69] at 4, denied the Government's reconsideration motion regarding whether the traffic stop was unlawfully extended[3]; but reversed the recommendation that suppression of the evidence and statements was

---

[3] "The Court acknowledges that officer safety is always a concern in any traffic stop. However, in this case, the Court considered the reason for the traffic stop—expired tags—and considered Officer Eilerman's testimony that he was collecting pedigree information from passengers to check for warrants. Although both officers testified at the hearing that they took certain measures for safety reasons, those measures involved actions such as asking if there were any firearms in the car and asking the passengers to get out of the car. At the hearing, Officer Eilerman was asked on at least two occasions why he collected pedigree information from passengers. *See* Hrng. Tr. (Doc. 51), p. 23-25. At no point did he indicate that he did so out of safety concerns. Instead, Officer Eilerman testified that, although passengers were not legally required to provide pedigree information during a traffic stop, he requested that information because he wanted to know

warranted, based upon the attenuation exception to the exclusionary rule. *Id.* Wright filed Objections to the Magistrate Judge's amended report and recommendation,[4] Doc. [70], and the Government filed its Response. The matter is now ripe for ruling.

## II.   De Novo Review

When a party objects to a magistrate judge's report and recommendation, the district judge must conduct a de novo review of the portions of the report, findings, or recommendations to which the party objected. *See* 28 U.S.C. § 636(b)(1)(C) ("A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made."); *United States v. Lothridge*, 324 F.3d 599, 600 (8th Cir. 2003) (citing 28 U.S.C. § 636(b)(1)). In conducting a de novo review, this Court may then "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C); *see also United States v. Craft*, 30 F.3d 1044, 1045 (8th Cir. 1994).

## III.   Factual Findings

On February 5, 2021, at approximately 8:45 p.m., St. Louis Metropolitan Police Department Officer Eilerman, conducted a traffic stop of a white Jeep Grand Cherokee being operated by Crossland. Wright was a front seat passenger in the Jeep. There were two other passengers in the backseat, Deonte Overall, and a woman whose name was not introduced at the hearing.

Officer Eilerman activated the patrol vehicle emergency lights and sirens to conduct a traffic stop after observing that the Jeep had no front license plate, heavily tinted windows, and an expired Missouri temporary tag. Ultimately, Officer Eilerman issued Crossland two traffic violation tickets, and released her and the other female passenger from the scene. Wright and Overall were charged

---

'everybody that is in the vehicle' and ran their information 'just to see if they have any active warrants.'" Doc. [69] at 5.

[4] First, Wright contends that the Magistrate Judge should not have amended her recommendation because the Government failed to argue the attenuation doctrine in its initial briefing of the case. Second, Wright argues that the attenuation doctrine does not purge the taint of the unconstitutionally prolonged traffic stop.

with drug-related offenses and taken into custody.

Officer Eilerman was assisted at the scene by Officer Humme who arrived approximately three minutes into the traffic stop. Both officers were equipped with, and utilized, body cameras. In addition, Officer Eilerman's patrol car was equipped with a dashboard camera. As a result, Wright's interactions with both officers were captured by audio and time-stamped video recordings.

When Officer Eilerman first activated his lights, the Jeep pulled over right away. Although there were four people in the Jeep, Officer Eilerman did not initially notice the two passengers in the backseat due to the heavily tinted windows.

The following occurred in the <u>first minute</u> of the stop:

- Officer Eilerman asked Crossland twice to roll the window down.

- Once she did, he explained to her the reason for the traffic stop – the plates on the vehicle were expired.

- Officer Eilerman asked Crossland if she had any weapons in the car. She answered affirmatively and told Eilerman it was under the driver's seat. Officer Eilerman asked Crossland to step out of the vehicle so he could, "render it safe for officer safety."

- While Crossland got out of the vehicle, Officer Eilerman also asked Wright if he had any weapons on him; Wright denied that he did.

- Once Crossland was out of the car, Officer Eilerman retrieved the gun from under Crossland's seat then asked if she had her driver's license.

- As Crossland looked through her purse for her identification, Officer Eilerman asked Wright if he had his driver's license as well. Wright responded he did not. Shortly after that, Crossland handed Officer Eilerman her driver's license and he told her she could get back into the Jeep.

5

The following occurred in the <u>second minute</u> of the stop:

- Officer Eilerman got out a pencil and pad, and while standing by the open driver's side door, and speaking to Wright, stated "Sir, let me get your info . . . ." Officer Eilerman then asked Wright for his last name. Wright responded that it was "Overall."

- Next, Officer Eilerman asked Wright for his first name. Wright stated it was "Larry."

- Officer Eilerman then asked Wright for his date of birth. Wright hesitated. After a noticeable pause, Wright asked the officer why he needed the information.

- Officer Eilerman responded, "because it's an investigative stop - traffic stop because of the plates alright; so the lights mean being detained okay, so when you're detained we do an investigation of everyone in the car, alright, that's why I'm getting your information sir."

- Officer Eilerman asked Wright again for his date of birth. This time, Wright provided a date of birth.

- When Officer Eilerman asked Wright for his social security number, Wright stated he did not know it. Officer Eilerman replied, "okay, alright, you got warrants or something man?" Wright's response was unclear. Officer Eilerman replied, "Okay. Sit tight for me, okay."

The following occurred in the <u>third minute</u> of the stop:

- Officer Humme arrived as the back-up officer and walked over to the passenger side of the vehicle and shined his flashlight into the vehicle, just as Officer Eilerman was finishing up with Crossland and making his way back to the patrol car to run the information he collected.

- Before Officer Eilerman got back to the patrol car, Officer Humme signaled to

6

> Officer Eilerman that there were also two individuals in the backseat of the vehicle. Officer Eilerman stated, "oh, there's four?" and returned to the driver's side passenger door on the Jeep.

The following occurred in the <u>fourth minute</u> of the stop:

- Officer Eilerman shined his flashlight in the driver's side passenger area and requested Crossland to unlock the driver's side backseat door after Crossland told him the window was damaged.

- Officer Humme meanwhile asked the backseat right passenger, Overall, if he had any weapons. Overall said he did not have a weapon but told him he had "weed" and lifted up two baggies of marijuana. Officer Humme opened the vehicle door to place Overall under arrest for possession of marijuana.

- Within a matter of seconds, Officer Eilerman opened the backseat driver's side door and requested that passenger's identification as well; while at the same time Officer Humme was placing Overall in handcuffs and patting him down.

- Officer Eilerman returned to the patrol car to begin his records inquiry.

Officer Eilerman initiated a records inquiry of Crossland, Larry Overall (the name given by Wright), and the driver's side backseat female passenger. His inquiry confirmed that Crossland was, in fact, the registered owner of the Jeep. However, the inquiry into Larry Overall—the name given by Wright—indicated that the name did not match the birthdate provided by Wright, suggesting to Officer Eilerman that Larry Overall was not Wright's real name. In addition, the inquiry revealed that Larry Overall had a warrant for his arrest and was a convicted felon.[5]

---

[5] Officer Eilerman credibly testified that he did not arrest Wright based upon the Larry Overall warrant because he was fairly certain Wright was not Larry Overall. Based on the interactions between the police officers and Wright captured on the bodycam video footage, it is clear that neither officer thought Wright was Larry Overall.

While Officer Eilerman conducted the records inquiry, Officer Humme interacted with Wright. Once Overall was handcuffed for possession of marijuana, Humme turned his attention to Wright who was still seated in the front passenger seat. Officer Humme shared with Wright that he found it suspicious that Wright did not know his social security number. He asked Wright to get out of the Jeep and Wright complied. As Wright got out of the car, he removed a bag that had been strapped to his body and left it inside the Jeep. Among other things, Officer Humme asked Wright if he had any "weed" on him. Wright indicated that he did. Officer Humme patted him down, removed the suspected marijuana, advised Wright he was under arrest for marijuana possession, and read him *Miranda* warnings from a card. Officer Humme then reached into the car and searched the bag Wright had removed and found narcotics and ammunition. At that point, Officer Humme advised Wright that he was under arrest for possession of additional controlled substances. Officer Humme flashed his flashlight in the direction of Officer Eilerman, seated in his patrol vehicle, to alert him that he found something. Shortly thereafter, Officer Eilerman exited the patrol vehicle and joined the men on the sidewalk.

Based on the items found in Wright's bag and on his person, Officer Humme advised Crossland that he was going to search the entire car. Thereafter, Officer Humme placed Wright's seized bag in his patrol vehicle and asked Crossland and the female backseat passenger to exit the Jeep so that he could conduct a search. Officer Humme searched the Jeep and ultimately found and seized a 9-millimeter handgun under the front passenger seat, where Wright had been seated, and a loaded AR style pistol in the trunk. Wright and Overall were transported to the St. Louis City Justice Center. Once at the Justice Center, it was determined that the front passenger was Carrell Wright, a convicted felon with an outstanding warrant from the U.S. Marshals Service.

Although Wright refused to provide his information when pressed by the officers to do so, the entire interaction between the officers, Wright, Crossland, and the other passengers was generally

8

cordial, and the passengers were compliant with the officers' commands. The officers' testimony at the evidentiary hearing was credible and largely consistent with the dashcam and bodycam videos.

## IV. Legal Standard

"A seizure for a traffic violation justifies a police investigation of that violation." *Rodriguez*, 575 U.S. at 354. "A relatively brief encounter, a routine traffic stop is more analogous to a so-called *Terry* stop than to a formal arrest." *Id.* (cleaned up). "Like a *Terry* stop, the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop and attend to related safety concerns." *Id.* (internal citations omitted). "Because addressing the infraction is the purpose of the stop, 'it may last no longer than is necessary to effectuate th[at] purpose.'" *Id.* (quoting *Florida v. Royer*, 460 U.S. 491, 500 (1983)). "Authority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Id.* (citing *United States v. Sharpe*, 470 U.S. 675, 686 (1985)).

During a lawful traffic stop, officers may also take actions that are "'reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop.'" *United States v. Warren*, 984 F.3d 1301, 1304 (8th Cir. 2021) (quoting *United States v. Hensley*, 469 U.S. 221, 235 (1985)). "Danger to an officer from a traffic stop is likely to be greater when there are passengers in addition to the driver in the stopped car." *Id.* at 1304 (quoting *Maryland v. Wilson*, 519 U.S. 408, 414 (1997)). Traffic stops are "'especially fraught with danger to police officers,'" so officers "may need to take certain negligibly burdensome precautions in order to complete his mission safely." *Rodriguez*, 575 U.S. at 356 (quoting *Arizona v. Johnson*, 555 U.S. 323, 330 (2009)). "Reasonable actions at the scene of an investigation to ensure safety and preserve the status quo require no probable cause or reasonable suspicion." *Warren*, 984 F.3d at 1305 (citing *Brendlin v. California*, 551 U.S. 249, 258 (2007)).

Although a traffic stop cannot be prolonged beyond the time reasonably required to complete

9

the mission of issuing a ticket for the violation, "the officer may still conduct certain routine tasks related to the traffic violation, including 'running a computerized check of the vehicle's registration and insurance; running a similar check of the occupants' identification documents and criminal histories; preparing the traffic citation or warning; and asking the occupants about their destination, route, and purpose.'" *United States v. Cox*, 992 F.3d 706, 710 (8th Cir. 2021) (quoting *United States v. Murillo-Salgado*, 854 F.3d 407, 414-15 (8th Cir. 2017).

The Court of Appeals for the Eighth Circuit, as well as numerous other courts, have held that such checks of occupants pertain to safety and are routine matters during traffic stops. *See United States v. Allen*, 43 F.4th 901, 907 (8th Cir. 2022) ("[O]fficers may continue the [traffic] stop while they complete tasks related to the stop, such as . . . checking the occupants' names and criminal histories[.]") (citing *Murillo-Salgado*, 854 F.3d at 415); *Saunders v. Thies*, 38 F.4th 701, 712 (8th Cir. 2022) (stating that during a traffic stop a police officer can check "the identification of the vehicle's occupants, including their criminal history"); *United States v. Foster*, 15 F.4th 874, 878 (8th Cir. 2021) (finding that a police officer "did not unlawfully expand the scope or extend the [traffic] stop when he asked for identification from the occupants of the vehicle"); *United States v. Harry*, 930 F.3d 1000, 1005 (8th Cir. 2019) (classifying "checking for outstanding warrants" as an "ordinary" inquiry related to "roadway safety"); *see also United States v. Price*, 4:18-cr-00224-DGK, 2019 WL 3210609, at *6-7 (W.D. Mo. June 21, 2019) (collecting cases concerning whether "inquiry into a passenger's identity is permissible"); *United States v. Morgan*, 4:17-cr-00086-BP, 2018 WL 6445419, at *2 (W.D. Mo. Dec. 10, 2018) ("An officer may also run a computer check to determine whether there are outstanding warrants for any passengers in the car."); *United States v. Smith*, 952 F.3d 642, 648 (5th Cir. 2020) (holding that a police officer "could examine the driver's licenses of the vehicle's occupants and check for any outstanding warrants"); *United States v. Clark*, 879 F.3d 1, 4 (1st Cir. 2018) (stating that "[a]lthough the Supreme Court has not explicitly held that an inquiry

10

into a passenger's identity is permissible, its precedent inevitably leads to that conclusion" (quoting *United States v. Fernandez*, 600 F.3d 56, 61 (1st Cir. 2010)); *United States v. Reynolds*, 729 F. App'x 639, 643 (10th Cir. 2018) (stating that "[w]hile a traffic stop is ongoing . . . an officer has wide discretion to take reasonable precautions to protect his safety, including asking for identification from passengers and running background checks on them"); *United States v. Sanford*, 806 F.3d 954, 956 (7th Cir. 2015) (stating that "[t]he trooper checked the occupants' criminal histories on the computer in his car—a procedure permissible even without reasonable suspicion—indeed a procedure in itself normally reasonable, as it takes little time and may reveal outstanding arrest warrants" (internal citations omitted)); *State v. Wharton*, 510 P.3d 682, 688 (Idaho 2022) ("[W]hen warrant checks on passengers do occur, they do not unlawfully extend a stop under *Rodriguez*.").

V.   **Discussion**

    a. *Rodriguez* – Mission of Traffic Stop v. Evidence of Criminal Wrongdoing

In *Rodriguez*, a police officer observed a traffic violation and pulled the vehicle over. The vehicle contained the driver, Dennys Rodriguez, and one passenger, Scott Pollman. The police officer first gathered Rodriguez's driver's "license, registration, and proof of insurance" and went to his patrol vehicle to perform a records check. *Rodriguez*, 575 U.S. at 351. The police officer then returned to the vehicle and asked the passenger for his driver's license and questioned the passenger about where he and Rodriguez were coming from and where they were going. *Id.* The police officer then returned to his patrol car a second time to perform a record check of the passenger, while calling in for a second officer. *Id.* The police officer then wrote a warning ticket for the traffic violation and returned to the vehicle for a third time to issue the written warning to Rodriguez. *Id.* at 352. "As [the officer] later testified, at that point, Rodriguez and [the passenger] 'had all their documents back and a copy of the written warning. I got all the reason[s] for the stop out of the way[.]" *Id.* It was at that point, the police officer proceeded with a dog sniff of the vehicle (that was determined to have

11

prolonged the stop by seven to eight minutes). *Id.* at 352-53. The question that the Supreme Court sought to resolve in *Rodriguez* was "whether police routinely may extend an otherwise completed traffic stop, absent reasonable suspicion, in order to conduct a dog sniff." *Id.* at 353.

The Supreme Court in *Rodriguez* subsequently differentiated a police officer's mission regarding a traffic stop from a police officer's actions aimed at "detecting evidence of ordinary criminal wrongdoing." *Id.* at 355. The mission of a traffic stop includes record checks, and "[t]hese checks serve the same objective as enforcement of the traffic code: ensuring that vehicles on the road are operated safely and responsibly." *Id.* at 355. Whereas a dog sniff "is a measure aimed at 'detecting evidence of ordinary criminal wrongdoing,'" it "is not an ordinary incident of a traffic stop," and because it is "lacking the same close connection to roadway safety as the ordinary inquiries, a dog sniff is not fairly characterized as part of the officer's traffic mission." *Id.* at 355-56 (cleaned up).

### b. Officer Eilerman's Actions Were Related to Traffic Stop Mission

It is clear from the record that Officer Eilerman's action were related to the mission of the traffic stop and consistent with officer safety concerns, including maintaining the status quo during the stop. Officer Eilerman activated the patrol vehicle emergency lights and sirens to conduct a traffic stop after observing a vehicle with no front license plate, heavily tinted windows, and an expired temporary tag. Officer Eilerman was the only officer at the scene of a traffic stop of a vehicle with, as far as he knew at the time, two occupants, and was told by the driver that a weapon was under her seat. Officer Eilerman explained to the driver that he needed to retrieve the firearm to "render it safe for officer safety." It stands to reason that Officer Eilerman would then ask Wright if he had a weapon. When Wright responded he did not, Officer Eilerman left it at that.[6] As Officer Eilerman was

---

[6] Officer Eilerman's questions to the driver and passengers were direct and to the point. He was courteous, explained to Crossland why she was pulled over, took Wright's word for it when he told Officer Eilerman he did not possess a weapon, explained to Wright why he requested his information, and did not press Wright any further when Wright did not reply if he had any warrants, or when Wright said he did not know his own social security number.

interacting with Crossland and Wright, Officer Humme arrived at the scene.

Officer Humme testified at the evidentiary hearing that he went directly to the passenger side of the vehicle to ensure officer safety. "As the assist officer, I am Officer Eilerman's cover officer, so he would approach the driver's side of the vehicle and I would approach the passenger so we could have multiple angles and viewpoints of the vehicle." Doc. [51] at 32. When asked why it was necessary to have such viewpoints of the vehicle, Officer Humme replied, "Just for officer safety so we can ensure we see everyone's hands and make sure they are not reaching for anything or trying to hide anything." *Id.*

While officer Humme was shining his flashlight into the backseat of the vehicle, Officer Eilerman was making his way back to his patrol car to do a record check. However, Officer Humme signaled to Officer Eilerman that there were also two individuals in the backseat of the vehicle. Officer Eilerman immediately returned to the driver's side passenger door on the Jeep, shined his flashlight in the window, and requested Crossland to unlock that door after Crossland told him the window was damaged. Officer Humme then opened the back passenger side door and ordered Overall out of the vehicle to arrest him for possession of marijuana. Within a matter of seconds, Officer Eilerman opened the back driver's side passenger door and requested that passenger's identification as well. Assuming police officers do not have to verbally express why they make every movement during a traffic stop, it seems implicit that Officer Eilerman returned to the driver's side back passenger door to investigate the situation for his and Officer Humme's safety. After making sure the backseat was secure, Officer Eilerman requested the driver's side back passenger's identification, while Officer Humme was simultaneously ordering Overall out of the car to arrest him for possession of marijuana.

Officer Eilerman's actions as set forth *supra* were reasonable, rationally related to the mission of the traffic stop, and consistent with officer safety concerns, including maintaining the status quo

13

during the stop. *Warren*, 984 F.3d at 1304.

### c. Traffic Stop Was Not Prolonged Under *Rodriguez*

Officer Eilerman did not prolong the traffic stop unlawfully when he spent two[7] minutes obtaining pedigree information from two of the passengers in the vehicle because Officer Eilerman's actions fell squarely within the mission of a traffic stop and the attendant safety of police officers. However, it is worth noting that in *Rodriguez*, the police officer requested the *passenger's* identification during a traffic stop for a traffic violation, after the police officer had already obtained and completed a record check of the *driver's* information. The request was not based upon reasonable suspicion of criminal activity and the Supreme Court did not find or even suggest that the police officer's inquiry into the passenger's identification was unlawful under the Fourth Amendment. Even if the Court had found that the traffic stop was unlawfully prolonged, the attenuation exception to the exclusionary rule applies.

## VI.   Objections

Wright set forth two Objections to the Magistrate Judge's Amended Report and Recommendation, (1) The Government did not raise the attenuation doctrine in its initial briefing and should not have been allowed to raise a new argument in a motion for reconsideration, and (2) the attenuation doctrine did not purge the taint of the unconstitutionally prolonged traffic stop.

Under the attenuation exception to the exclusionary rule, a court may admit evidence that would not have been discovered but for official misconduct if the causal connection between the illegal conduct and the acquisition of the evidence is sufficiently attenuated to dissipate the taint of an illegal action. *Wong Sun v. United States*, 371 U.S. 471, 487-88 (1963). In *Wong Sun,* the Supreme

---

[7] A review of Officer Eilerman's body and dash cams, and Officer Humme's body cam, reveal that, in fact, the amount of time Officer Eilerman spent gathering Wright's information was approximately one minute. And the amount of time Officer Eilerman spent checking the backseat for safety and gathering the backseat passenger's information was under a minute; however, Officer Humme was simultaneously ordering Overall out of the backseat to handcuff, pat down, and arrest him.

Court held that the proper inquiry is whether the evidence was obtained through exploitation of the constitutional violation or instead by means attenuated from the constitutional violation to purge the evidence of its initial tint. *Id.* at 488. The Supreme Court listed three factors that courts can consider in determining whether the causal chain is sufficiently attenuated: (1) the time elapsed between the constitutional violation and acquisition of the evidence; (2) the presence of intervening circumstances; and (3) the purpose and flagrancy of the misconduct. *Brown v. Illinois*, 422 U.S. 590, 603-04 (1975). The Eighth Circuit has applied those factors to cases, like this case, involving an allegedly illegal detention. *See United States v. Becker*, 333 F.3d 858, 862 (8th Cir. 2003) (applying the *Brown* factors to determine whether causal chain was sufficiently attenuated by consent to search given following an illegal detention).

The Magistrate Judge found in her Amended Report and Recommendation that, "[i]n applying the exclusionary rule, the Court's Report and Recommendation failed to consider whether the causal chain between the illegal extension of the traffic stop and the officers' discovery and seizure of incriminating evidence was sufficiently attenuated by the activities of Officer Humme." Doc. [69] at 8. The Magistrate Judge analyzed the *Brown* factors, and determined,

> In sum, although the first *Brown* factor does not necessarily support a finding of attenuation, the second and third Brown factors do strongly support a finding that, because of the intervening circumstance of Officer Humme's separate discovery of marijuana on the rear seat passenger, the causal connection between Officer Eilerman's illegal conduct and Officer Humme's subsequent acquisition of the evidence is sufficiently attenuated to dissipate the taint of the illegal action. *Wong Sun*, 371 U.S. 471 at 487-88 (1963). As such, Wright's motion to suppress evidence and statements should be denied because application of the exclusionary rule is not warranted under these circumstances.

*Id.* at 11. The Magistrate Judge subsequently adopted and incorporated her legal conclusions regarding the attenuation exception to the exclusionary rule in its Amended Report and Recommendation. Had the Court determined that the traffic was unlawfully prolonged, the Court agrees with the Magistrate Judge's legal analysis and conclusion that the attenuation exception to the

15

exclusionary rule would apply in this instance. As such, Wright's Objections to the Amended Report and Recommendation are overruled.

### VII.    Conclusion

(1) The Court declines to adopt the Findings of Fact as Amended by the Magistrate Judge in her Amended Report and Recommendation, Doc. [69], and issues its own factual findings herein; (2) The Court adopts the Magistrate Judge's Conclusion of Law as to probable cause for the traffic stop; (3) The Court declines to adopt the Conclusion of Law, as amended by the Magistrate Judge in her Amended Report and Recommendation, Doc. [69], finding that Officer Benjamin Eilerman's passenger pedigree inquiry was akin to an unrelated criminal investigation and unlawfully prolonged the traffic stop pursuant to *Rodriguez*, 575 U.S. 348; (4) The Court finds as a matter of law that the inquiries into passenger pedigree information in this matter was reasonable and rationally related to the mission of the traffic stop, police officer safety concerns, and necessary to maintain the status quo of the traffic stop; (5) The Court adopts the Magistrate Judge's Conclusion of Law as to the applicability of the attenuation exception to the exclusionary rule to this matter if it had found the traffic stop was unlawfully prolonged; (6) The Court overrules Wright's Objections to the Amended Report and Recommendation; and (7) The Court denies Wright's Motion to Suppress Statements and Evidence, Doc. [41].

Dated this 8th day of November, 2022

_____
MATTHEW T. SCHELP
UNITED STATES DISTRICT JUDGE